Matthew Shaye<u>far</u> (<u>SBN</u> 289685)
matt@shayefar.com
Law Office of Matthew Shayefar, PC
750 N San Vicente Blvd, 800 West
West Hollywood, California 90069
Tel: 323-948-8101 | Fax: 323-948-8107

*Attorney for Plaintiffs*

JS-6

NOTE CHANGES MADE BY THE COURT

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LENA THE PLUG LLC, and LENA NERSESIAN,<br>　　Plaintiffs<br><br>vs.<br><br>BRADLEY CHETCUTI, KNIGHTSBRIDGE PARTNERS, LLC, and DOES 1-10,<br>　　Defendants | Case No.: 2:19-cv-04063-RGK-GJS<br><br>[~~PROPOSED~~]<br>**ORDER GRANTING MOTION FOR DEFAULT JUDGMENT** |

Plaintiffs Lena the Plug LLC ("LTP") and Lena Nersesian moved for an entry of default judgment against Defendants Bradley Chetcuti and Knightsbridge Partners, LLC, finding Defendants liable for Plaintiffs' causes of action set forth in the Complaint – namely, for (I) Breach of Contract; (II) Breach of Covenant of Good Faith and Fair Dealing; (III) Unjust Enrichment; (IV) Quantum Meruit; (V)

1
Order on Motion for Default Judgment

Fraud; (VI) Trademark Infringement and Unfair Competition and False Designation of Origin (VII) Violation of California Civil Code Section 3344; (VIII) Unlawful and Unfair Business Practices; (IX) Federal Anti-Cybersquatting Consumer Protection Act; (X) Conversion; and (XI) Accounting.

The Court, having read and considered Plaintiffs' motion, pleadings, moving papers, and the other filings in this case, finds as follows:

**A.   Findings of Fact:**

1. ~~Ms. Nersesian is an accomplished model with millions of followers across social media. She has had over 1.8 million followers on Instagram, 1.4 million subscribers on YouTube, hundreds of thousands of followers on Twitter, and tens of thousands of fans and followers on Snapchat and OnlyFans.~~ Since early 2016, Ms. Nersesian has been known by her moniker "Lena the Plug." Ms. Nersesian runs her business through Plaintiff Lena the Plug, LLC ("LTP").

2. LTP has submitted trademark applications to the USPTO for the marks LENA THE PLUG and LENA'S PLUGS. On January 19, 2021, the USPTO issued a trademark for registration of the LENA THE PLUG trademark, Registration Number 6252013. The application for LENA'S PLUGS is still pending as of the date hereof.

3. In late 2016, Mr. Chetcuti, ~~knowing the power of Ms. Nersesian and her brand,~~ reached out to Ms. Nersesian and offered to manage Ms. Nersesian's

members-only social media business on Snapchat. They agreed that Mr. Chetcuti would manage a website for Ms. Nersesian's fans to purchase memberships to access her Snapchat feed. They agreed that Mr. Chetcuti would be responsible for creating, maintaining, and updating that website to make it easy and seamless for fans to purchase (and cancel) memberships. Mr. Chetcuti was also responsible for maintaining the billing for the memberships. All of this was to be for the benefit of Ms. Nersesian and LTP. The parties agreed that as payment for Mr. Chetcuti's continued services, he would be allowed to retain 20% of the revenue (less payment processing costs) from the Snapchat memberships, and that he would pay the rest to LTP on a bi-weekly basis.

4.   As part of Mr. Chetcuti's services, he registered the domain name <lenasplugs.com>, where he hosted the website for users to purchase Snapchat memberships. LTP at the time had already registered <lenatheplug.com> and was using it for other purposes. Mr. Chetcuti also created a CCBill payment processing account in the name of Defendant Knightsbridge Partners, LLC, through which all Ms. Nersesian's Snapchat membership payments were processed.

5.   Almost since the beginning of their relationship, Mr. Chetcuti repeatedly failed to correspond with Ms. Nersesian in good faith and failed to implement features for the website that he repeatedly promised her he would implement. His failure to do his work cost Ms. Nersesian tens or hundreds of

thousands of dollars in lost revenue. Since the breakdown in their relationship (more below), Ms. Nersesian has moved to a new platform to manage her social media subscriptions. ~~and is now making far more than she ever did while she was working with Mr. Chetcuti.~~

6. ~~It is apparent that~~ Mr. Chetcuti never had any intention of acting in good faith with her. ~~Aside from simply not complying with his obligations, he almost immediately began to steal from Ms. Nersesian. The extent of Mr. Chetcuti's theft is still hidden, but, at the very least,~~ Ms. Nersesian eventually learned that Mr. Chetcuti was only paying Ms. Nersesian 70% of the revenues, rather than the 80% to which they had agreed. ~~Just~~ The difference between paying 70% and 80% comes out to approximately $225,000 in fraudulently withheld payments.

7. At first, after learning of Mr. Chetcuti's actions, Ms. Nersesian offered Mr. Chetcuti the chance to remedy the situation and continue working together. On December 20, 2018, Ms. Nersesian asked Mr. Chetcuti to take some time to speak about putting together a written agreement to control the relationship of the parties going forward. ~~Only in mid-January did Mr. Chetcuti deem it important enough to substantially respond.~~ In early February 2019, Ms. Nersesian sent Mr. Chetcuti a proposed written agreement for the terms of them continuing to work together. The proposed agreement put in writing Mr. Chetcuti's obligations

to LTP for managing memberships, confirmed the revenue splits between the parties going forward, and set forth a procedure to audit all past transactions so that the parties could resolve any prior inconsistencies between what Mr. Chetcuti paid and Ms. Nersesian was owed.

8. In the months that followed, Mr. Chetcuti made it clear that he had no intention of ever acting in good faith, and that he had from the beginning intentionally defrauded Ms. Nersesian. ~~First, it took over a month before Mr. Chetcuti even bothered to respond to the draft agreement. And~~ Instead of attempting to negotiate the contract, Mr. Chetcuti issued an ultimatum: either Ms. Nersesian just agree to continue to allow things to go on as they always had, except now with a requirement that Ms. Nersesian generate a minimum revenue per month ~~(as if Mr. Chetcuti's failure to perform his own obligations weren't what was holding the business back)~~ or Ms. Nersesian could pay Mr. Chetcuti tens of thousands of dollars ~~just so~~ for Mr. Chetcuti ~~would~~ to release control of the business to her, including the <lenasplugs.com> domain name. ~~Given that it was Mr. Chetcuti that was stealing from Ms. Nersesian, of course neither of these options were acceptable.~~

9. ~~Mr. Chetcuti took his abuse one step further~~ In the beginning of April 2019, ~~when~~ he ~~simply~~ stopped paying any portion of the revenues from the Snapchat memberships to Ms. Nersesian. From April 2019 through at least January

of 2020, Mr. Chetcuti continued to bill recurring membership charges to Ms. Nersesian's members, but kept 100% of the money, amounting to up to $217,000.

10. As of the filing of the Complaint, Mr. Chetcuti maintained the website premiumsnaps.com, where he sold memberships to Ms. Nersesian's private Snapchat feed, using LTP's trademarks and Ms. Nersesian's likeness, even though he paid no part of the revenues to Ms. Nersesian.

**B.   Procedural History**

11. Plaintiffs filed the Complaint in this matter on May 9, 2019.

12. Plaintiffs served Defendant Knightsbridge on May 29, 2019.

13. On June 17, 2019, Plaintiffs and Defendants entered a stipulation with the Court that Defendants' counsel, Pryor Cashman LLP, accepted service of the summons and complaint on behalf of Mr. Chetcuti as of June 14, 2019.

14. Defendants filed their Answer to the Complaint on July 15, 2019. For a short period thereafter, Defendants' counsel appeared on behalf of Defendants and through them Defendants participated in this case.

15. On January 9, 2020, the Parties took part in mediation and entered into a Settlement Term Sheet, setting forth the principal terms of a complete settlement of this matter that was contingent on certain conditions and, a short time later, entered into a definitive settlement agreement.

16. On April 30, 2020, Plaintiffs filed a motion for this Court to enforce a judgment that was part of the definitive settlement agreement arising from Defendants' failures to comply with their obligations thereunder, including an obligation for Defendants to transfer a domain name to Plaintiffs and make agreed upon payments to Plaintiffs. Within days afterwards, Defendants' counsel, Pryor Cashman LLP, filed a Motion to Withdraw as Counsel for Defendants, citing a complete breakdown of the attorney-client relationship because Defendants failed to meaningfully communicate with their counsel and had not paid their counsel for their services in over eight months. The Court ultimately denied Plaintiffs' motion to enforce the judgment, but did grant the motion for Pryor Cashman to withdraw as counsel for Defendants on July 1, 2020.

17. As part of its order granting the motion to withdraw, the Court ordered that the corporation defendant, Knightsbridge, was required to retain new counsel within 25 days. Knightsbridge failed to retain new counsel and, accordingly, the Court struck the answer of Knightsbridge on August 10, 2020.

18. Knightsbridge never retained new counsel and never filed a new answer to the Complaint.

19. On February 24, 2021, the Court scheduled the Pretrial Conference for this case for July 12, 2021, at 9:00am. In advance of this hearing, Defendants did not file their memoranda of contentions of facts and law, witness list, or exhibit

list. Nor did Defendants respond to Plaintiffs' request to file a joint status report as required by the Court on January 27, 2021. Nor did Defendants respond when Plaintiffs' counsel sent them a draft Final Pretrial Conference order in accordance with F.R.Civ.P. 16 and L.R. 16.

20. On July 12, 2021, Plaintiffs' counsel appeared in Court for the Pretrial Conference as ordered by the Court. Defendants did not appear. Accordingly, the Court ordered that the answers filed by all defendants be stricken and that Plaintiffs move for default against them.

21. On September 3, 2021, Plaintiffs applied to the clerk to enter default against Defendants and the Clerk entered Default against the Defendants on September 9, 2021.

22. Default having been entered, default judgment is now appropriate in accordance with Rule 55(b)(2) of the Federal Rules of Civil Procedure.

C. **Conclusions of Law**

23. Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment after the Clerk enters default under Rule 55(a). "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." (*Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977)).

24.    Plaintiffs' Motion for Default Judgment is further supported by declarations, which the Court find sufficient for compliance with FRCP 54 and 55, and Local Rules 55-1, 55-2, and 55-3 as further set forth in the Motion itself.

25.    Plaintiffs have furthermore satisfied the factors for entry of default as set forth in *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Namely: (1) Plaintiffs will suffer prejudice if default judgment is not entered because they have no way to obtain recovery against Defendants for their actions and omissions; (2) the substantive merits and sufficiency of the Complaint and Plaintiffs' causes of action have been shown, as detailed in Plaintiffs' motion; (3) the monetary damages sought are balanced with the seriousness of Defendants' conduct, which includes taking advantage of a young woman and intentionally withholding funds from her from a position of trust; (4) Defendants' refusal to engage in the litigation process despite numerous opportunities results in a finding that there are no material facts in dispute and that there is no excusable neglect; and (5) the policy favoring decisions on the merits does not preclude default judgment because Defendants have refused to participate in this case.

26.    On the basis of the foregoing, this Courts that there is proper jurisdiction and basis to award default judgment against Defendants as follows:

## FINAL JUDGMENT, INJUNCTION, AND ORDER FOR RELIEF

27. THIS COURT HEREBY FINDS that Defendants are liable for (I) Breach of Contract; (II) Breach of Covenant of Good Faith and Fair Dealing; (III) Unjust Enrichment; (IV) Quantum Meruit; (V) Fraud; (VI) Trademark Infringement and Unfair Competition and False Designation of Origin (VII) Violation of California Civil Code Section 3344; (VIII) Unlawful and Unfair Business Practices; (IX) Federal Anti-Cybersquatting Consumer Protection Act; (X) Conversion; and (XI) Accounting.

28. IT IS ORDERED THAT actual damages shall be awarded to Plaintiffs in the amount of Four Hundred Forty-Two Thousand Dollars ($442,000), payable by Defendants jointly and severally.

29. IT IS FURTHER ORDERED that, because of Defendants' willful and fraudulent actions, and other actions as set forth above, that treble damages and/or punitive damages in the amount of Eight Hundred Eighty-Four Thousand Dollars ($884,000) are warranted under, *inter alia*, 15 U.S.C. § 1117(a), 15 U.S.C. § 1117(d), and California Civil Code Section 3344.

30. IT IS FURTHER ORDERED that Plaintiffs are entitled to further damages in the form of attorneys' fees and costs. The Court finds, in this context, fixing of reasonable actual fees is warranted in the amount of $26,500 and $2,822.90 in costs and expenses, payable by Defendants jointly and severally.

31. ACCORDINGLY, the total monetary damages awarded to Plaintiffs, and payable by Defendants, jointly and severally, is One Million Three Hundred Fifty-Five Thousand Three Hundred Twenty-Two Dollars and Ninety Cents ($1,355,322.90).

32. IT IS FURTHER ORDERED, that post-judgment interest shall accrue in accordance with the statutory maximum on judgments until the monetary judgment is satisfied.

33. ~~IT IS FURTHER ORDERED, that Plaintiffs shall be entitled to any further attorneys' fees and costs incurred in connection with collecting upon and exercising their rights in accordance with this Judgment.~~

34. IT IS FURTHER ORDERED that Defendants shall also immediately transfer the ownership, registration and control of the domain name lenasplugs.com to Lena the Plug LLC. Any and all domain name registrars and registries, hosting providers and other service providers of the domain name are hereby ordered to transfer ownership, registration, and control of the domain name to Lena the Plug LLC.

35. IT IS FURTHER ORDERED that Plaintiffs are granted the following injunctive relief that Defendants are permanently enjoined and restrained from:

    a.    Using any of Plaintiffs' marks, names, brands, likenesses or other assets;

       b.    Using any name, mark, or domain name that wholly incorporates Plaintiffs' marks, names, or brands, or any name, mark or domain name that is confusingly similar to Plaintiffs' marks, names, or brands;

       c.    Registering, transferring, selling, owning or exercising control over any domain name that incorporates, in whole or in part, Plaintiffs' marks, names, or brands, or anything confusingly similar thereto;

       d.    Retaining any monies arising from the sale of memberships to access any content, streams, or social media accounts of Plaintiffs; and

       e.    Otherwise infringing upon any rights of Plaintiffs.

**~~ENFORCEMENT AND JURISDICTION~~**

~~36.   IT IS FURTHER ORDERED that monies currently held in various Defendants' accounts held by banks, savings and loan associations, payment processors or other financial institutions or merchant providers, payment providers, third-party processors, credit card associations (e.g., MasterCard and VISA), which receive payments or hold assets on Defendants' behalf, are hereby released to Plaintiffs as partial payment of the above-mentioned damages.~~

37. ~~IT IS FURTHER ORDERED that in accordance with this Court's inherent equitable powers and its power to coerce compliance with its lawful orders, until Plaintiffs have recovered the full payment of monies owed to them by any Defendants under this Judgment, in the event Plaintiffs discover new monies or accounts belonging to or controlled by any Defendants, Plaintiffs shall have the ongoing authority to serve this Judgment on any party controlling or otherwise holding such accounts or other merchant account providers, payment providers, or third party processors, and that all such persons shall immediately locate and restrain all accounts belonging to or controlled by Defendants from transferring or disposing of any money, stocks or other of such Defendants' assets, not allowing such funds to be transferred or withdrawn by such Defendant and shall provide Plaintiffs with information relating to those accounts.~~

38. ~~IT IS FURTHER ORDERED that within thirty (30) days following the service of this Judgment on Defendants or any of the other parties subject to the orders above, such parties shall transfer all monies in restrained accounts to Plaintiffs, unless Defendants or any such parties have filed with the Court and served upon Plaintiffs' counsel a written request that such monies be exempted from this Judgment, with the basis therefor.~~

39. IT IS FURTHER ORDERED that any third-party referenced above shall, within fourteen (14) days of receipt of this Judgment, provide copies of all

documents and records in such party's possession or control relating to the location of Defendants and any financial accounts owned or controlled by Defendants.

40. IT IS FURTHER ORDERED that this Court shall retain jurisdiction over the parties and the subject matter of this litigation for the purpose of interpretation and enforcement of this Judgment.

IT IS SO ORDERED

Dated: November 19, 2021    _____
                                          United States District Judge